### UNITED STATES of America, Plaintiff-Appellee,

v.

### Vito ALBERTI, a/k/a Joe Lamport, Jorge Merlano Sierra, a/k/a George Merlano, Defendants-Appellants.

No. 82–5841.

United States Court of Appeals, Eleventh Circuit.

March 19, 1984.

---

**1057**

William N. DeCarlis, Gainesville, Fla., for Alberti.

Donald I. Bierman, Bierman, Sonnett, Beiley & Shohat, P.A., Robert M. Duboff, Benedict P. Kuehne, Miami, Fla., for defendants-appellants.

Michael T. Simpson, Asst. U.S. Atty., Pensacola, Fla., for plaintiff-appellee.

Before TJOFLAT and FAY, Circuit Judges, and WISDOM *, Senior Circuit Judge.

* Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designa-

FAY, Circuit Judge:

Appellants Vito Alberti and Jorge Merlano Sierra appeal their convictions by the United States District Court for the Northern District of Florida on charges of conspiracy with intent to distribute marijuana in violation of 21 U.S.C. §§ 841 and 846 (1966), and conspiracy to import marijuana into the United States contrary to 21 U.S.C. §§ 952(a) and 963 (1966). Appellants present several significant issues for consideration by this court: (1) whether the evidence adduced at trial supported the jury's finding that the defendants were engaged in multiple conspiracies; (2) whether the evidence was sufficient to prove that appellants knowingly and intentionally participated in a conspiracy to possess with intent to distribute marijuana; and (3) whether the district court abused its discretion in denying appellants' motions for severance. Finding that the evidence was sufficient to support the finding of multiple conspiracies and to convict both defendants upon the conspiracy to possess with intent to distribute count and that no error was committed by the district court in its denial of appellants' motion to sever, we affirm both convictions.

I. FACTUAL AND PROCEDURAL
 BACKGROUND

As part of an ongoing investigation of federal drug law violations, the United States Drug Enforcement Administration (DEA) enlisted the cooperation of Jerry Jenkins, an unlicensed pilot who had previously smuggled methaqualone into the United States. Jenkins agreed to report to the DEA any solicitations which he received for his services as a drug courier. In late December, 1981 or early January, 1982, Jenkins was approached by John O'Brien. O'Brien wanted Jenkins to fly O'Brien's airplane to Jamaica to pick up two loads of marijuana. Although O'Brien did have an airplane, he agreed with Jenkins that Jenkins would supply a larger airplane, a

tion.

Beechcraft Queenair, and a co-pilot. Jenkins also located an airstrip in Bascom, Florida for use during the return and offload of the marijuana from Jamaica. O'Brien and Jenkins discussed very specific details regarding the proposed Jamaican runs, including the arming of the Bascom airstrip and the amounts to be collected by Jenkins, by his co-pilot (DEA agent Vance Huffman) and by "the plane's owner" (DEA agent Richard Hahner). Jenkins did fly to Jamaica in the Queenair on February 3, 4 and 5, 1982, but did not bring back any marijuana.

In the midst of these discussions regarding the Jamaican runs, O'Brien asked Jenkins and Hahner to participate in a deal to fly marijuana from Colombia for "some Italians from California." O'Brien had a number of discussions with Jenkins and Huffman with regard to the arrangements for the proposed Colombian runs, several of which were tape recorded by the government and used as evidence at trial. O'Brien mentioned a "Vito" as the "right hand man" in the Colombian deal and as the "lieutenant of the big man from California." A meeting was to be held in Atlanta with the Californians and with "Jorge," the Colombian connection. O'Brien told Jenkins, Huffman and Hahner that their compensation would be fixed in advance for the Colombian deal, and stated that the landing strip in Bascom would be used to unload. O'Brien would retain a portion of the marijuana to secure his payment and that of the pilots and the airplane owner. The "California people" would have a representative on the airstrip to take their portion of the cargo. Eight thousand dollars advance money for the airplane was to be received in Atlanta.

Soon thereafter, O'Brien arranged for Jenkins to meet "Vito" (Alberti), whom O'Brien described as "working for the big man," and "Jorge" (Sierra), who was referred to as "the Colombian connection." Sierra in turn introduced Henry, a Colombian who did not speak English, to the pilots. Henry was to be part of the crew in Colombia which loaded the marijuana and he was introduced to Jenkins so that they could recognize each other. Alberti and Sierra described the landing site to Jenkins and handed him three thousand dollars.

After several days of further telephone calls and meetings with O'Brien, Jenkins and Huffman met with O'Brien in Panama City, Florida on February 11, 1982. O'Brien stated that the three thousand dollars advance money, which had been paid in Atlanta, and the fifty-six hundred dollars, which would be paid in Tallahassee during a meeting later that day with Alberti and Sierra, was flowing from the "big man in California" through Alberti.

Jenkins and Huffman followed O'Brien to Tallahassee where O'Brien, Alberti and Sierra met with the pilots in a hotel room on February 13, 1982. During this meeting the arrangements for the initial run to Colombia were being hammered out. Sierra and Alberti discussed with the pilots the preferred dates for departure from and reentry to the United States, the specific location of the Colombia airstrip, the amount of marijuana to be transported, and the relative profitability of "running" marijuana and methaqualone. After extensive discussion finalizing the details of the first Colombian venture, DEA agents entered the hotel room and arrested the appellants.

Alberti, Sierra, and O'Brien were charged in a two-count indictment with conspiracy to possess with intent to distribute more than one thousand pounds of marijuana in violation of 21 U.S.C. §§ 841 and 846 (1966), and conspiracy to import marijuana into the United States contrary to the provisions of 21 U.S.C. §§ 952(a) and 963 (1966). All defendants entered pleas of not guilty and requested trial by jury.

Prior to trial, the defendants filed several motions, including motions for severance. These motions for severance were denied. After a four-day trial, a jury found Alberti, Sierra and O'Brien guilty as to both counts. The court then sentenced Alberti to a ten-year jail term and a $100,000 fine on count I, and five-year consecutive sentence on count II. Sierra was given a term of incarceration of fifteen years and fined $125,000

on count I, and a concurrent term of five years and a $15,000 fine on count II. Alberti and Sierra appeal from these convictions.

## II. THE FINDING OF MULTIPLE CONSPIRACIES

The appellants urge that the evidence adduced at trial did not support the jurors' conclusions that appellants were guilty of two separate and distinct conspiracies. They urge that because the plot to smuggle marijuana from Colombia to the United States constituted one agreement among an identifiable group of persons, the evidence could only support the appellants' convictions as to one conspiracy. We disagree.

 The appellants' argument is the flip side of the contention, often advanced in conspiracy cases, that the evidence at trial cannot support a jury finding that a single conspiracy existed. *United States v. Brito,* 721 F.2d 743 at 746 No. 82–5168, slip op. at 941 (11th Cir.1983); *United States v. Watson,* 669 F.2d 1374, 1379–80 (11th Cir. 1982); *United States v. Tilton,* 610 F.2d 302, 307 (5th Cir.1980).[1] It is important to note that the scope of our review in analyzing the single/multiple conspiracy question is identical whether a defendant is claiming, as here, that there is one conspiracy notwithstanding a jury finding of two, or whether he is contesting a jury finding of one overall conspiracy. The determination of whether there are one or more conspiracies in a given case is a classic jury question. *United States v. Brito,* at 747; *United States v. Michel,* 588 F.2d 986, 995 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); *United States v. Rodriguez,* 509 F.2d 1342, 1348 (5th Cir.1975). We may thus reverse the jury's finding that multiple conspiracies existed only if the evidence could not permit reasonable jurors to have found, beyond a reasonable doubt,

that several conspiracies existed. *See United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc). Reviewing the evidence, we conclude that there was support for the jury's conclusion that appellants were engaged in more than one conspiracy.[2]

## III. SUFFICIENCY OF THE EVIDENCE

 Appellants challenge the sufficiency of the evidence supporting their convictions for conspiracy to possess with the intent to distribute marijuana. Appellant Alberti further contends that the district court erred in not granting him a judgment of acquittal as to this count. The applicable standard of review for a sufficiency challenge was recently enunciated in *United States v. Bell,* 678 F.2d at 547:

> It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

678 F.2d at 549 (footnote omitted).

In applying this standard we are also mindful that the evidence and all reasonable inferences are to be viewed in a light most favorable to the Government. *Id. See also Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

 The most basic element required to establish a conspiracy claim is an agreement between two or more persons to violate federal narcotics laws. *United States v. Lee,* 694 F.2d 649, 652 (11th Cir.1983), *United States v. Tamargo,* 672 F.2d 887, 889 (11th Cir.1982), *cert. denied,* 459 U.S. 864, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982). Al-

---

1. Decisions of the Fifth Circuit handed down prior to September 30, 1981, are binding precedent on this Court unless and until overruled or modified by this Court en banc. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

2. In addition, appellants asked for a charge on multiple conspiracies and such a charge was given. The jury instruction accurately conveyed the law in this area. *United States v. Brito,* at 747. The jury properly applied the instruction and found that appellants had engaged in more than one conspiracy.

though in most conspiracy cases the Government must also demonstrate an overt act in furtherance of the conspiracy, no such requirement exists when the charge involves a drug conspiracy in violation of 21 U.S.C. § 846. *United States v. Badolato,* 701 F.2d 915, 919–20 (11th Cir.1983). What the Government must demonstrate is that a conspiracy existed, that the defendant had knowledge of it, and that he or she voluntarily became a part of it. *United States v. Lippner,* 676 F.2d 456, 466 (11th Cir.1982).

 It is also clear that the existence of a drug conspiracy may be demonstrated by circumstantial evidence such as inferences from the conduct of the defendant or the circumstances indicating a scheme or plan. *Lee,* 694 F.2d at 652; *Lippner,* 676 F.2d at 466. Moreover, the requirement of knowledge of the conspiracy agreement refers simply to knowledge of the essential objective of the conspiracy. *Tamargo,* 672 F.2d at 889. To be found guilty, a defendant need not have knowledge of all the details of the conspiracy, and may only play a minor role in the entire operation. *Lee,* 694 F.2d at 652; *United States v. Nickerson,* 669 F.2d 1016, 1022 (5th Cir.1982).

Appellants do not contest that a conspiracy to possess with intent to distribute marijuana existed among some persons. Likewise, neither appellant seriously contests that he had knowledge of the existence of the broad Colombian operation. Appellants argue, rather, that the evidence does not establish their joinder or association with the conspiracy to distribute the marijuana. They contend that O'Brien kept the importation scheme separate from the distribution plan, and that they had no interest or stake in the fate of the marijuana once it reached the United States. Viewing the evidence in a light most favorable to the government, we find that the record indicates otherwise.

 The testimony of the agents at trial and the tape-recorded conversation among defendants reveal Alberti and Sierra's extensive knowledge of and interest in handling the marijuana once it reached the United States. Circumstantial evidence

provided *inter alia,* (1) that the "California people" who were to receive part or all of the load would have a representative at the Bascom airstrip to take their share; (2) that a portion of the money used to finance the operation came from proceeds, collected by Alberti, from other drug distributions in New York; (3) that Sierra was quite concerned as to the profits to be made through marijuana distribution; (4) that both appellants discussed the marketing prospects of the operation; and (5) that Sierra would have a representative at Bascom to meet the aircraft as it arrived from Colombia. In short, it is clear that Alberti and Sierra had extensive knowledge of the proposed distribution plan. Accordingly, we conclude that a reasonable jury could have found beyond a reasonable doubt that the evidence established Alberti's and Sierra's knowing participation in that conspiracy, and that the district court did not err in denying Alberti's motion for a judgment of acquittal.

## IV. MOTIONS FOR SEVERANCE

 Each appellant maintains that his trial should have been severed from the trials of his co-defendants. Federal Rule of Criminal Procedure 14 authorizes severance if the district court determines prejudice will result from joinder. But the decision to sever lies within the sound discretion of the district judge, and will not be overturned in the absence of abuse of that discretion. *United States v. Riola,* 694 F.2d 670, 672 (11th Cir.1983). Moreover, a district court decision will not be overturned unless appellants can demonstrate that they received a fundamentally unfair trial and "suffered compelling prejudice against which the trial court was unable to offer protection." *Id.*

 Both Alberti and Sierra maintain that they suffered a compelling prejudice from extrinsic evidence admitted against their co-defendant O'Brien, and that in the absence of this spill-over effect they would not have been convicted. The evidence which appellants primarily complain of con-

cerned the Jamaican deal in which O'Brien, with a separate set of co-conspirators, engineered a plan which was largely repeated with respect to the Colombian marijuana. We find no merit to appellants' contentions. We agree with the district court that the evidence of the Jamaican and the Colombian deals was so intertwined that the latter case could not be presented without substantial mention of the former. Such evidence is not "extrinsic" and is admissible. *See United States v. McCrary,* 699 F.2d 1308 at hn. 4 (11th Cir.1983). Additionally, a review of the record convinces us that there was no danger that the jury could be misled into believing that either Alberti or Sierra had anything to do with the Jamaican trip. *See Lippner,* 676 F.2d at 464–65. The great majority of the testimony regarding the Jamaican deal was presented in separate segments of the witness' testimony than descriptions of the Colombian plans. Further, at each introduction of testimony as to the Jamaican plans, the trial court gave a similar act instruction and noted that the evidence was only admissible against O'Brien.

## V. OTHER ISSUES

The appellants additionally raise two other arguments: (1) that the district court erred in refusing to allow appellants to inquire as to why the government did not bring marijuana to the landing site and thus determine the role of each conspirator in the drug smuggling operation; and (2) that the prosecutor's closing argument deprived appellants of a fair trial in that it mentioned the possible death of law enforcement officials on the Bascom landing strip. We find no merit whatsoever to these arguments.

## VI. CONCLUSION

Finding no error in the trial court proceedings, we AFFIRM both convictions.